## Larry James Varnum v. Christine Carol Varnum

[586 A.2d 1107]

No. 87-308

Present: Allen, C.J., Dooley and Morse, JJ., and Keyser, J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned

Opinion Filed November 30, 1990

*Gensburg Axelrod & Adler*, St. Johnsbury, for Plaintiff-Appellee.

*John L. Kellner* of *Langrock Sperry Parker & Wool*, Middlebury, for Defendant-Appellant.

**Dooley, J.** This is a divorce action between Larry James Varnum, plaintiff, and Christine Carol Varnum, defendant. They were divorced by order of the Caledonia Superior Court on May 17, 1987. Although the trial court dealt with all issues between the parties, the only appeal issues relate to custody of the two children of the marriage—Mack, now age 13 and Sarah, now age 11. The court awarded legal and physical responsibility for both children to plaintiff, and defendant appeals that award. We affirm.

Defendant makes four arguments in this Court: (1) the trial court's custody decision impermissibly considered her religious beliefs and activities, in violation of the United States and the Vermont Constitutions; (2) the trial court failed to consider and accord weight to defendant's status as the primary care giver as required by 15 V.S.A. § 665(b)(6);[1] (3) the trial court made key

---

[1] Section 665 of Title 15 governs the court's responsibilities in determining which parent should be awarded custody following a divorce. The section provides, in pertinent part:

(a) In an action under this chapter the court shall make an order concerning parental rights and responsibilities of any minor child of the parties. . . .

(b) In making an order under this section, the court shall be guided by the best interests of the child, and shall consider at least the following factors:

(1) the relationship of the child with each parent and the ability and disposition of each parent to provide the child with love, affection and guidance;

findings of fact that were unsupported by the evidence and clearly erroneous; and (4) the trial court's setting of a strict time limitation for the presentation of each side's case deprived defendant of a fair trial. After setting forth the facts, we discuss these arguments in order.

Although the hearing in this case was long and acrimonious,[2] the trial court reduced the testimony to fifty-three findings, made orally and on the record. The following is a summary of the findings.

The parties were married in California and relocated by joint decision to Vermont in 1978. Defendant has a daughter from a prior marriage who lived with them in California and relocated with them to Vermont. One of the children of the parties was born shortly before the move, and one was born shortly thereafter. The marriage was fraught with difficulty, and the parties separated twice before seeking a divorce. They last lived together in 1985. Plaintiff filed this action that same year, and defendant was awarded temporary custody of the two minor children. Defendant's daughter returned to California to live with her natural father.

---

    (2) the ability and disposition of each parent to assure that the child receives adequate food, clothing, medical care, other material needs and a safe environment;

    (3) the ability and disposition of each parent to meet the child's present and future developmental needs;

    (4) the quality of the child's adjustment to the child's present housing, school and community and the potential effect of any change;

    (5) the ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the other parent, including physical contact, except where contact will result in harm to the child or to a parent;

    (6) the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development;

    (7) the relationship of the child with any other person who may significantly affect the child;

    (8) the ability and disposition of the parents to communicate, cooperate with each other and make joint decisions concerning the children where parental rights and responsibilities are to be shared or divided. . . .

[2] The merits hearing took the better part of five days to conclude. The transcript runs to over eight hundred pages. The proceedings in this case were charged with emotion and anger. We need not revisit the entire battlefield to resolve the issues before us.

The court made extensive findings relating to the ability of each parent to raise the children and serve as primary custodian. It found that both parties had secure jobs and sufficient income to raise the children. It found that plaintiff had on one occasion slapped defendant on the face but had otherwise not been physically or sexually abusive toward her. It rejected as not credible defendant's other allegations that plaintiff sexually and physically abused her.

Each party alleged that the other physically abused the children. The court found that plaintiff had used a belt to administer discipline to defendant's daughter, and on one occasion used the belt on his son. It found, however, that such discipline was not occurring at the time of the hearing and that plaintiff did not use physical discipline on a regular basis. It found that defendant physically abused the two children and that she believes:

> strict discipline is essential to install a conditioned response in the children to certain demands imposed upon them by her. When the children fail to respond to her, she believes that it is appropriate and she does administer physical punishment to the children and has done so with various implements which includes [sic] a spoon, a ladle and a paddle.
>
> The Defendant has punished the children by striking them about the face and body using both her hands and other implements with sufficient force to leave red marks on the children's skin. The court finds that that physical discipline does amount to physical abuse.

Defendant's daughter alleged that plaintiff had sexually abused her when she was living with the parties in Vermont. The court found this accusation not credible.

Both parties have abused alcohol, and defendant twice attempted suicide while under the influence of alcohol. Although defendant has been told she should not consume alcohol, she continues to be a moderate drinker.

Both parties spend a great deal of their free time with the children. The findings detail activities in which each party participates with the children to show, with respect to each parent, a supportive relationship. Each parent has a residence and can

provide safe and suitable care for the children. If she obtained custody, defendant intended to return to California with the children.

The trial court made a number of findings that relate to defendant's religious beliefs. Defendant is a Jehovah's Witness and is a strict disciple of her faith. Her belief in physical punishment to discipline the children was apparently related to her religion. Because of her religious belief, she forbade the children to have close relationships with children who were not members of her faith, and would not allow the children to celebrate birthdays or holidays although the children traditionally celebrated holidays and found it enjoyable. Defendant would not permit blood transfusions even if told by a doctor that the children needed the procedure. There was, however, no evidence of health problems in the children that would create the need for a transfusion. Defendant deferred to church elders for help in making decisions. The court found that allowing others to assist in decision making hampered her ability to determine the best interests of the children.

The court ordered a psychological evaluation of the parties and the children. The psychologist's evaluation recommended that custody be awarded to plaintiff. Although the psychologist's conclusions were based on numerous factors, the most important were that: (1) if defendant obtained custody, she intended to severely limit plaintiff's access to the children and move from the state as soon as possible; (2) plaintiff had "a better attitude and concept of what children need to be raised in a normal fashion"; and (3) defendant admitted "to hitting the children and leaving marks on their body, a sign of physical abuse." Based on the evaluation, which the court found was fair to both parties, and the extensive evidence, the court concluded that it would be in the best interests of the children to award parental rights and responsibilities primarily to the plaintiff father.

## I.

Defendant first argues that because the court made findings of fact that touched upon her religious beliefs and because the issue of religion permeated the trial, the court violated the free exercise clauses of the Vermont and United States Constitu-

tions.[3] She argues, therefore, that the custody decision of the superior court must be vacated and the cause remanded for a new custody hearing.

Defendant acknowledges that her constitutional argument is raised for the first time on appeal and was never brought before the trial court. Although there was extensive evidence about the religion and religious practices of each party, with an emphasis on the religious practices of defendant, neither party objected to the introduction of the evidence or its use in arriving at a custody determination. Both parties submitted evidence pertaining to religion.

It is, of course, black-letter law that this Court will not consider an issue not raised below, see *Albarelli v. Albarelli*, 152 Vt. 46, 49, 564 A.2d 598, 600 (1989), except in extreme and unusual circumstances. See *State v. Hoadley*, 147 Vt. 49, 53, 512 A.2d 879, 881 (1986). Defendant argues that this is one of those rare cases because important interests and basic constitutional rights are involved, and analogizes to the criminal cases where we have reviewed unpreserved errors on a finding of plain error. See, e.g., *State v. Ayers*, 148 Vt. 421, 425–26, 535 A.2d 330, 333–34 (1987) (plain error "strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice"); *In re Maher*, 132 Vt. 560, 562, 326 A.2d 142, 144 (1974) (state employee's due process claim reviewable only upon showing that "this is one of those rare and extraordinary cases which is so

---

[3] The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This amendment is applied to the several states through the Fourteenth Amendment. The Vermont Constitution states:

That all men have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; and that no man ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of his conscience, nor can any man be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments, or peculia[r] mode of religious worship; and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship. . . .

Vt. Const. ch. I, art. 3.

grave and serious that it strikes at the very heart of the employee's constitutional rights"). In evaluating the claim, we recognize that fundamental rights and interests are at stake. See *Osier v. Osier*, 410 A.2d 1027, 1029 (Me. 1980).

We also recognize, however, that there are weighty interests on the other side of the scale. The children in this case have already gone through five of the most important years of their lives under temporary custody orders, and have had during this period one change of primary custodian. The negative effect of this basic family instability, with the resulting rivalries between their parents, is likely to be profound. There is no reason to believe that the trial judge would have been insensitive to the religious liberty issue defendant raises in this Court if there had been one whisper of it prior to the filing of defendant's brief here.

■ We have no clear precedent to govern the standard of review in this case. Our precedents on unpreserved constitutional claims in civil cases do not involve the weighty countervailing interests of children. See *In re Maher*, 132 Vt. at 562, 326 A.2d at 144. Nor do our precedents in the family law area address constitutional issues. See, e.g., *Brown v. Brown*, 154 Vt. 625, 630–32, 580 A.2d 975, 978–79 (1990) (admissibility of evidence). Even with the important rights and interests defendant seeks to vindicate, we think the balance tips decidedly in favor of enforcing rules of preservation to avoid the impact of lengthy delays on the well-being of the children. We therefore approach defendant's first claim under a very limited standard of review—whether there has been a fundamental miscarriage of justice that we cannot overlook.

■ Consideration of religion and religious practices in custody determinations may implicate the right to free exercise of religion protected by the First Amendment to the United States Constitution and Chapter I, Article 3 of the Vermont Constitution. See *Developments in the Law—The Constitution and the Family*, 93 Harv. L. Rev. 1156, 1339–40 (1980). It is often said, as a result, that the courts must be neutral in matters of religion. See *Waites v. Waites*, 567 S.W.2d 326, 333 (Mo. 1978); *Munoz v. Munoz*, 79 Wash. 2d 810, 813, 489 P.2d 1133, 1135 (1971). While neutrality is a worthy goal, it is rarely

achievable in a contested custody matter where the actions of the parents bearing directly on the best interest of the children are attributed to religious beliefs. More often, the courts must engage in a form of balancing of the relevant interests, similar to the process we recently employed in *State v. DeLaBruere*, 154 Vt. 237, 248–49, 577 A.2d 254, 260–61 (1990), in resolving conflicts over the education of children between the state and religiously-motivated parents. See *Fisher v. Fisher*, 118 Mich. App. 227, 232, 324 N.W.2d 582, 584–85 (1982). In such a balance, we must be careful to minimize the degree of interference with religious liberty and use the "least restrictive means" to accomplish the legitimate objectives that warrant the interference. *State v. DeLaBruere*, 154 Vt. at 255, 557 A.2d at 264.

■ There is no question that the societal interest in protecting and nurturing children is great. See *Fisher v. Fisher*, 118 Mich. App. at 232, 324 N.W.2d at 584 ("difficult" to conceive of a more compelling state interest); *Morris v. Morris*, 271 Pa. Super. 19, 26, 412 A.2d 139, 143 (1979). Thus, in appropriate cases, this interest must override the freedom of the parent to engage in religious practices. See *Felton v. Felton*, 383 Mass. 232, 233, 418 N.E.2d 606, 607 (1981). The challenge for the courts is to accommodate the differing interests where possible and protect the best interest of children while minimizing the interference with religious liberty. See *Osier v. Osier*, 410 A.2d at 1031. To do so, the courts have developed tests that require a religious practice to have a direct and immediate negative impact on the physical or mental health of the child before the practice can be considered in determining the custody of the child. See *Ex parte Hilley*, 405 So. 2d 708, 711 (Ala. 1981); *Stapley v. Stapley*, 15 Ariz. App. 64, 70, 485 P.2d 1181, 1187 (1971); *Levitsky v. Levitsky*, 231 Md. 388, 398, 190 A.2d 621, 626 (1963); *LeDoux v. LeDoux*, 234 Neb. 479, 486, 452 N.W.2d 1, 5 (1990); *In re Marriage of Knighton*, 723 S.W.2d 274, 282–83 (Tex. Ct. App. 1987).

In applying these principles to this case, we are mindful that defendant's religion, and numerous practices dictated or motivated by her religion, permeated the trial. We are also mindful that defendant's beliefs may appear peculiar and foreign to many. Indeed, many of the cases involving the impact of religion of a parent on the custody determination of a child have in-

volved Jehovah's Witnesses and the courts, and the larger society, have found it difficult to accept, or ignore, their religious practices even when the impact on the children is speculative or insufficient to allow an impairment of religious freedom. See Annotation, *Religion as Factor in Child Custody and Visitation Cases*, 22 A.L.R.4th 971, 998–1006 (1983) (section summarizing cases involving custody disputes where one parent is a Jehovah's Witness).

Finally, we must accept that the trial court made findings and considered aspects of defendant's religious practices even though it did not find the required impact on the well-being of the children. On this record, we place in that category findings with respect to restrictions defendant imposed on the ability of the children to associate with peers who are not Jehovah's Witnesses and her prohibition on the celebration of holidays and birthdays. We are also concerned about the use of the finding that defendant would not allow her children to have blood transfusions even if medically necessary, in the absence of any evidence that such an eventuality is likely and cannot be resolved in ways other than depriving defendant of custody. See *Waites v. Waites*, 567 S.W.2d at 334; *Osier v. Osier*, 410 A.2d at 1031–32.

It is not surprising that the trial court's findings and conclusions do not show a careful consideration of the constitutional standard and the arguments defendant makes in this Court, since the issue was never presented to the trial court. Also, with respect to some facts, the deficiency may have been in failing to make complete enough findings, although such findings would have been supported by the evidence. For example, the evidence may have allowed the trial court to find that the prohibition on the celebration of birthdays or holidays has a direct and immediate negative effect on the emotional health of the children, but the court was not requested to make a finding on this issue.

Nevertheless, we cannot find that there has been a miscarriage of justice in the custody award to plaintiff. In reaching this decision, we are motivated by the following considerations.

First, the primary reason for the psychologist's custody recommendation was the physical discipline imposed regularly by the mother. This also appears to be the primary reason for the

trial court's custody determination. While defendant's practices may have had some religious motivation, the evidence clearly supported the conclusion that the physical discipline had a direct and immediate negative impact on the physical and mental well-being of the children. We do not mean to suggest that all physical discipline by parents is prohibited or that, when religiously motivated, it has no First Amendment protection. However, the discipline here was sufficiently severe for the court to characterize it as "physical abuse." The trial court could heavily weigh the use of this physical discipline against defendant.

Second, there was extensive analysis, both by the expert and in the evidence, of all aspects of the strengths and weaknesses of the parties as prospective custodial parents. In fact, many of the factors that supported the court's decision were wholly unrelated to the religious beliefs of defendant. See *Clift v. Clift*, 346 So. 2d 429, 436–37 (Ala. Civ. App. 1977) (custody award affirmed where also supported by considerations not involving religion); accord *Aldous v. Aldous*, 99 A.D.2d 197, 199–200, 473 N.Y.S.2d 60, 62–63 (1984). Thus, the expert found that plaintiff had a better attitude and concept of the needs of the children. An important part of the psychologist's recommendation was based on observations of the interaction between the children and each parent, and the court made findings about these interactions.

Third, although the trial court made no findings in this area, the evidence showed also that defendant intended to minimize plaintiff's access to the children. The psychologist recounted defendant's statements that plaintiff had little to offer the children in large part because he was not a Jehovah's Witness and thus did not possess the "truth" about life. The psychologist found that defendant's "attitude of indifference to the children's right to appreciate both parent's views will cause the children emotional harm." Even though the trial court made no findings on this subject, we believe it bears on whether there was a miscarriage of justice in this case.

Finally, the failure of defendant to make a proper record in the trial court causes her difficulty in making out a free exercise claim for a first time in this Court. While there is a general sense that many of the defendant's practices are tied in some general way to her religion, there is no specificity on the exact

nature of her religious belief and the extent to which it commands the practices. Thus, we can only evaluate in a rough way the extent to which forgoing some of the practices would burden defendant's religious expression, an essential aspect of the balancing equation for First Amendment purposes. See *State v. DeLaBruere*, 154 Vt. at 247–48, 577 A.2d at 260. Two examples will suffice. Although there was a general assertion that physical discipline is associated with the child-rearing practices of a Jehovah's Witness, there was no specific testimony that defendant's religious beliefs required defendant to hit the children with instruments like the butter paddle and spoon. Similarly, the court pointed to the fact that defendant appeared to routinely turn important decisions in her life over to church elders and concluded that her ability to determine "the best interests of the children is hampered by her need to have other people make her decisions." The evidence does not show whether the involvement of the elders in parental decision-making is required by defendant's religious beliefs.

■ In conclusion, we are satisfied that the trial court's custody award was justified, even though the court did not examine specifically the aspects of defendant's religious beliefs and practices that do not directly and immediately impact on the mental and physical well-being of the children. The consideration of defendant's religion did not cause a miscarriage of justice, and we decline to reverse on that basis.

II.

[5] Defendant next argues that the trial court did not adequately weigh her status as the primary care giver as required by 15 V.S.A. § 665(b)(6). Her argument is based primarily on this Court's decision in *Harris v. Harris*, 149 Vt. 410, 418, 546 A.2d 208, 214 (1988), where we held that this factor should be given great weight unless the primary custodian is unfit. Defendant actually makes two interrelated points here: (a) the trial court failed to determine who was the primary custodian and to recognize the legal significance of this finding; and (b) the trial court failed to give the necessary weight to this factor. On the first point, *Harris* requires that the record show that the trial court has considered each of the relevant statutory

factors. *Id.* at 414, 546 A.2d at 211. Here, the court stated that it considered all of the statutory factors and specifically stated that it considered "[t]he quality of the child relationship with the primary care provider." As the defendant points out, there was no dispute as to who was the primary care provider of the children either under the temporary order in effect at the time of trial or throughout the marriage. It was not essential for the court to state this obvious and undisputed fact. The court properly considered the statutory factor.

We also see no error in the weight assigned to this factor. In *Harris*, we held that the court must give the factor "great weight unless the primary custodian is unfit." *Id.* at 418, 546 A.2d at 214. We stated that the exact weight cannot be determined "unless there is evidence of the likely effect of the change of custodian on the child" and, in the absence of such evidence, the court should ordinarily order that the child remain with the primary custodian. *Id.* at 419, 546 A.2d at 214. This latter language was critical to the *Harris* holding because there was no evidence in the record of the effect on the children of a change of custodian.

The present case is very different from *Harris*, and the difference is critical to the decision. Here, there was extensive evidence of the interaction of each parent with the children and the plans of each parent if he or she were awarded custody. More important, the court ordered an independent evaluation of the parties and the children by a recognized expert in the area of family relations, and the expert did a thorough investigation of the relative merits of each party as a primary custodian and the effect of a custody award for either party. In the course of the evidence and the expert evaluation, defendant's status as primary care giver over the course of the marriage was recognized, analyzed and weighed. Defendant's fitness as a custodian, in light of her use of excessive physical discipline, was central to the analysis and weighing. If anything, this case is a model of how to evaluate the likely effects, pro and con, of changing the primary custodian of children.

### III.

Defendant's third argument is that two of the trial court's findings are not supported by the evidence: (1) the finding that

defendant was not physically abused, except on one occasion, nor sexually abused; and (2) the finding that she physically abused the children.

The first point goes to defendant's claim that plaintiff physically abused her throughout the marriage, often in the presence of the children, and that his propensity for violence should have been considered in the custody determination. Specifically, defendant argues that plaintiff admitted to more instances of physical abuse than the court found, and that the error prejudiced the result. We agree that plaintiff admitted that there were other incidents, but he disputed that his conduct involved physical abuse. It is also difficult to gauge the relevance of these claims to the custodial decision because they generally occurred during periods when both parties were abusing alcohol and intoxicated frequently. Neither party was abusing alcohol at the time of the lower court proceedings. The disputed finding is not clearly erroneous. See *Fenoff v. Fenoff*, 154 Vt. 450, 453, 578 A.2d 119, 120 (1990).

The second claim actually reflects an objection to the trial court's use of the term "physical abuse" to describe defendant's acts of physical discipline. Defendant claims that the evidence did not support a finding of "child abuse" as that term is defined in 33 V.S.A. § 4912 (formerly 33 V.S.A. § 682). The purpose of that statutory definition is to implement a system of reporting of incidents to state authorities and investigation of these reports. While it appears that the record could have supported a finding of child abuse, the real answer to the argument is that there is no indication that the court was intending to use the term "physical abuse" in a particular way. The psychologist testified that the children were being physically abused by defendant's disciplinary practices, and the court accepted this characterization. The finding is not in error.

IV.

Finally, defendant argues that the trial court's time restrictions on the presentation of evidence deprived her of a fair trial, likening the situation to that present in *Auger v. Auger*, 149 Vt. 559, 546 A.2d 1373 (1988). The court imposed time limits on the presentation of evidence based on the time estimates provided

by counsel. The time limit was set at eleven hours for each side, and there was no objection to the limit. The court reminded the parties of the limits throughout the trial. Plaintiff never exceeded his time. Defendant ran out of time while cross-examining plaintiff after he testified as a rebuttal witness. Defendant's counsel indicated there were "a number of statements made which we have yet to cross-examine," and stated that he wanted to ask "three questions" of his client on surrebuttal, but he made no offer of proof. The court gave defendant's counsel another five minutes, and he used it for further cross-examination. He indicated no objection when the evidence was terminated by the court.

■ Vermont Rule of Evidence 611(a) directs the court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" to "avoid needless consumption of time." We think that the power granted by Rule 611(a) includes the authority to set reasonable limits on the consumption of time in examining witnesses. See *United States v. Reaves*, 636 F. Supp. 1575, 1577–80 (E.D. Ky. 1986). We agree with the observation of the Maine Supreme Judicial Court that counsel left to their own devices may "proceed at a pedestrian pace unsuited to times when court calendars are crowded and the costs of litigation to the parties and to the taxpayer are unreasonably high." *State v. Gatcomb*, 397 A.2d 185, 188 n.6 (Me. 1979). We also stress that limits must be reasonable and sufficiently flexible to ensure that important evidence is not excluded due to artificial time constraints. See *Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir. 1987).

The time limits in this case were generous and were based on the estimates of counsel. The trial started in March and did not finish until the middle of May. The trial had gone beyond the introduction of new facts. The transcript consumes almost 850 pages. It is difficult to see what could have been left out or how the "omission" could have affected the result.

This case bears no relationship to *Auger v. Auger*, where we acknowledged the power of the trial court to control the presentation of evidence but reversed because the active interrogation of witnesses by the judge was such that one of the parties was denied a trial free from the suspicion of partiality. 149 Vt. at 564, 546 A.2d at 1376. There is no indication of partiality here.

Finally, we note that even if the time limits were too rigid, defendant failed to preserve the issue for review. She failed to make a timely objection to the time limit and failed to make an offer of proof when her cross-examination was terminated by the expiration of the extended time. See *Johnson v. Ashby*, 808 F.2d at 678–79. Absent preservation, or a fundamental miscarriage of justice, we could not reverse even if we found an abuse of discretion.

*Affirmed.*