LARRY DOUGLAS GARRETT, APPELLANT, V. JEANNE LEA GARRETT, APPELLEE.

527 N.W.2d 213

Filed January 31, 1995.   No. A-94-237.

John S. Mingus, of Mingus & Mingus, for appellant.

Steven R. Voigt, of Butler, Voigt & Brewster, P.C., for appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

MUES, Judge.

Larry Douglas Garrett appeals the divorce decree issued by the Buffalo County District Court, wherein custody of his four minor children was awarded to his wife, Jeanne Lea Garrett. Upon our de novo review, we conclude that the district court did not abuse its discretion in awarding custody of the minor children to Jeanne, and therefore, we affirm.

## I. FACTUAL BACKGROUND

Larry and Jeanne Garrett were married on January 29, 1982, in Hot Springs, South Dakota. At the time of trial, Larry was 45 or 46 years of age and Jeanne was 33 years of age. The couple had four children, whose ages at the time of trial were as follows: Laren, 10 years; Lindy, 8 years; Laurel Lea, 6 years; and Larry, Jr., 20 months.

### 1. PROCEDURAL HISTORY

On March 23, 1993, Larry filed a petition for divorce, requesting custody of the couple's minor children. Contemporaneous with the petition for divorce, Larry filed an affidavit and a request for an ex parte order granting him temporary custody of the children. Additionally, Larry filed a motion requesting that the court appoint a child custody officer to meet with the parties to discuss custody and visitation issues.

On March 25, the district court issued an order appointing Alana Anderson as child custody officer and directing Anderson to evaluate, mediate, and report to the court her findings. A hearing was held regarding the temporary custody order on April 1, whereupon the court took legal custody of the children and placed them in the physical custody of Larry.

On July 7, 1993, the court on its own motion requested an additional hearing regarding the temporary custody and temporary visitation issues. The court informed the parties that it had received a report from Dr. John Meidlinger, a certified clinical psychologist appointed by the court to conduct an independent evaluation and prepare recommendations for custody in the Garretts' case. After hearing arguments from both sides, the court ordered that the children should remain in the custody of the court, but that, consistent with Dr. Meidlinger's report, it would be in the best interests of the children to place them in temporary foster care, with visitation granted to each parent. The children were subsequently placed in the physical custody of the Schroll family.

On October 4, 1993, Jeanne filed a motion for temporary placement, requesting that the four minor children be removed from foster care and temporarily placed in Jeanne's physical custody. A hearing was held on Jeanne's motion on October 15. The district court received into evidence a new report from Dr. Meidlinger which indicated that foster care was no longer in the best interests of the children. On October 26, the district court issued an order wherein the court maintained custody over the children. However, temporary physical custody of the children was awarded to Jeanne, with weekend visitation rights granted to Larry. Larry was also ordered to pay child support.

A trial was held in the district court on all issues on December 9 and 10, 1993. On December 20, the district court issued an order dissolving the Garretts' marriage, dividing the property between the parties, awarding custody of the four minor children to Jeanne, and requiring Larry to pay $420 toward Jeanne's attorney fees. Additionally, Larry was granted certain visitation rights with the children and ordered to pay $423 per month in child support.

Larry filed a motion for new trial on December 30, 1993. A

hearing was held on that motion on January 31, 1994, and the motion was denied. The record indicates that Larry had filed a second motion for new trial on different grounds prior to the hearing on the first motion for new trial. At the hearing on the first motion for new trial, the district court refused to hear argument on the second motion for new trial, instructing Larry that he had to obtain a specific date and time for a hearing on those issues. The record does not indicate that a hearing on the second motion for new trial ever took place.

## 2. Evidence Adduced at Trial

The main issue in question at the trial on December 9 and 10, 1993, was custody of the children. Two psychologists, Dr. A. James Fix and Dr. Meidlinger, had examined Larry, Jeanne, and the four minor children and were called as expert witnesses to testify as to each parent's qualifications for obtaining custody.

As noted previously, Dr. Meidlinger was the expert appointed by the court to examine each parent for a determination of fitness for custody. Dr. Meidlinger described Jeanne as having "significant problems," including the fact that she suffered from what appears to be chronic depression. He noted that she came from a dysfunctional family and tended to be angry, tense, bitter, rigid, and resentful. Dr. Meidlinger also stated that Jeanne tended to be rather distant and emotionless in her presentation.

However, Dr. Meidlinger testified that Jeanne had made vast improvement since he first visited with her. He reported that Jeanne had consulted her physician and was currently taking antidepressant medication, as well as continuing her outpatient counseling. Additionally, Dr. Meidlinger was impressed that Jeanne returned to him voluntarily to seek further help and that they had discussed continuing counseling in the future. Dr. Meidlinger testified that Jeanne's energy level was increasing, that she was experiencing fewer symptoms of depression, and that she was more prepared to take on the responsibility of caring for her children.

Dr. Meidlinger testified that his first impression of Larry was that Larry was friendly, outgoing, and charming. However, the

tests that Larry took indicated that he was trying to present himself in the best possible light, rather than being open and honest. Dr. Meidlinger reported that further counseling sessions revealed that Larry was attempting to polarize the children by talking about the divorce when he visited with them and repeatedly saying bad things about Jeanne. Dr. Meidlinger testified that because of this polarization, the children were not capable of making a mature, responsible choice regarding which parent they would rather live with. However, Dr. Meidlinger did note that the children generally stated that they preferred to live with their mother. Dr. Meidlinger determined that it would be in the best interests of the children to have custody granted to Jeanne.

After Dr. Meidlinger issued his report, Larry sought a second opinion from Dr. Fix, who testified at trial during Larry's case in chief. Dr. Fix tested and interviewed Larry, Jeanne, and the four minor children. He determined that Jeanne suffered from chronic depression, which Dr. Fix classified as a "psychiatric disorder." He thought that Jeanne might be subject to flareups of depression symptoms. According to Dr. Fix, two of the children told him that they preferred to live with Larry. Dr. Fix determined that though neither Larry nor Jeanne was unfit, Larry would be in a better position to be a parent.

In addition to Dr. Fix, Larry called a number of witnesses to testify about the effect of Jeanne's religion on the children. Jeanne is a member of the Jehovah's Witnesses. The record reflects that the children are also being raised in that faith. As such, the children are discouraged from participating in birthday celebrations and the Pledge of Allegiance at school. A teacher from the children's elementary school, Lois Dimmitt, testified that the children have trouble understanding why they are not allowed to participate and that it makes the children feel awkward. Larry testified that in addition to the restrictions on school activities, the children are discouraged from celebrating any holiday, with the exception of a Jehovah's Witness holiday called Memorial. Furthermore, Jeanne testified that as a Jehovah's Witness, she would refuse to allow any of her children to receive a blood transfusion, even if the child's life was in peril and the transfusion was desperately needed. Jeanne

testified that in an emergency situation, it would not be easy to refuse the blood transfusion, but that she would request that the physicians use alternative methods of treatment.

In addition to the evidence set forth above, each side presented testimony indicating that the other inflicted excessive corporal punishment on the children in isolated instances. The record also reflected that the oldest child, Laren, had refused to accompany her siblings on visitation trips to Larry's residence after temporary custody was awarded to Jeanne because Laren felt that Larry did not care for the children as well as Jeanne did.

### 3. DISTRICT COURT'S DECISION

The district court determined that custody of the children should be awarded to Jeanne. The district court noted that Larry had attempted to show that Jeanne's religion adversely impacted the children, but held that

> [d]espite the presence of three psychologists [Drs. Meidlinger and Fix and Dr. Jerry Denton, who examined only Larry] during the course of the trial, no evidence was submitted to the court which would demonstrate that the mother's religious convictions or possible activity limitations would be detrimental to the proper development of the children's personality or well being.

Then, after briefly reviewing the testimony of Drs. Meidlinger and Fix, the district court held:

> The totality of the evidence reveals that each party has a psychological problem which could adversely affect and impact on the children. Mr. Garrett, through his behaviors in the instant matter, has confirmed Dr. Meidlinger's opinion that Mr. Garrett has attempted to be manipulative throughout these proceedings, has at times avoided frankness and candor, and has overly involved the children in the custody controversy. The evidence also reveals that Mr. Garrett has followed through on recommendations concerning counseling, but the evidence does not reveal that Mr. Garrett's approach to the custody issue and custody problems have been positively effected [sic].

> Mrs. Garrett has and does suffer from chronic depression. The evidence reveals that the depression in the past and currently is controllable by medications and counseling. The records indicate that Mrs. Garrett has acknowledged her problem, has obtained suitable and proper medical assistance, and will continue in the future to participate in the necessary help programs to regulate her condition.

The district court found, based on the totality of the evidence, that the four minor children should be placed in the custody of their mother subject to Larry's visitation rights.

## II. ASSIGNMENTS OF ERROR

Larry asserts what appear to be 16 different assignments of error. Those assignments of error can be summarized as follows: The district court erred in (1) awarding custody of the four minor children to Jeanne, (2) excluding all testimony and documentary material relating to whether the Jehovah's Witnesses are a cult, (3) limiting the cross-examination of Jeanne and refusing to reschedule the trial so that such cross-examination could be had, and (4) sustaining and overruling various objections. Finally, Larry assigns as error the judge's failure to recuse himself on the grounds that he had prejudged the case in a fashion that affected his ultimate decision.

## III. STANDARD OF REVIEW

In an action for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994).

## IV. ANALYSIS

### 1. CUSTODY OF THE CHILDREN

In our de novo review, our concern is whether the custody determination is in the best interests of the Garrett children. The ultimate test in determining the appropriateness of an award of custody of minor children is reasonableness, as determined by the facts of each case, and the trial court's determination will be affirmed in the absence of an abuse of

discretion. *Kroenke v. Kroenke*, 239 Neb. 699, 477 N.W.2d 583 (1991).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through the judicial system. *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994); *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994).

■ Neb. Rev. Stat. § 42-364 (Reissue 1993) sets forth the statutory basis for judicial determination of child custody. In determining a child's best interests under § 42-364, the court may consider factors such as general considerations of the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between the child and the parents; the age, sex, and health of the child and the parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension, regardless of chronological age, and when such child's preference for custody is based in sound reason; and the general health, welfare, and social behavior of the child. *McDougall v. McDougall*, 236 Neb. 873, 464 N.W.2d 189 (1991); *Beran v. Beran*, 234 Neb. 296, 450 N.W.2d 688 (1990); *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989).

The instant case presents a difficult situation because of the two primary grounds upon which Larry argues that Jeanne is not the proper choice for the custodial parent: Jeanne's well-documented depression and the fact that Jeanne practices the precepts of the Jehovah's Witnesses religion.

In its decree dissolving the marriage in the instant case, the trial court agreed that Jeanne suffered from depression, but also noted that Larry had been manipulative, involving the children to a high degree in the custody battle by constantly discussing the case and disparaging Jeanne in front of the

children. Testimony from Dr. Meidlinger indicated that Larry's actions in this regard showed that he was more concerned with himself and his winning the case than he was for the actual welfare of the children. Thus, the district court was left with the difficult decision of choosing between two parents, both of whom had serious problems. The district court chose Jeanne.

An appellate court is required to conduct a de novo review of dissolution cases and, when the evidence is in conflict, may consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994). If the record contained nothing more than the above-referenced descriptions of the respective parties, the district court would clearly not have abused its discretion by awarding custody to Jeanne.

However, Larry contends that there is an additional factor which should tip the scales in his favor: the fact that Jeanne is a practicing Jehovah's Witness. The obvious constitutional problems raised by this argument were addressed by the Nebraska Supreme Court in *LeDoux v. LeDoux*, 234 Neb. 479, 485-86, 452 N.W.2d 1, 5 (1990):

> The free exercise clause of the first amendment to the U.S. Constitution forecloses governmental regulation of religious beliefs. "Government may neither compel affirmation of a repugnant belief . . . nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities . . . ." . . . Courts must preserve an attitude of impartiality between religions and may not disqualify a parent solely because of his or her religious beliefs. . . .
>
> Although the prohibition against infringement of religious belief is absolute, the immunity afforded religious practices by the first amendment is not so rigid. A state may abridge religious practices upon a demonstration that some compelling state interest outweighs a complainant's interests in religious freedom. . . .
>
> The paramount consideration in all cases involving the custody or visitation of a child is the best interests of the

child. [§ 42-364]. . . . Courts have a duty to consider whether religious beliefs threaten the health and well-being of a child. . . . Prohibiting a court from considering " 'religious factors under any circumstances would blind courts to important elements bearing on the best interests of the child.' " . . . "The right to practice religion freely does not include liberty to expose . . . the child to . . . ill health . . . ." . . . Thus, *when a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat.* . . . In so doing, a court must narrowly tailor its order so as to result in the least possible intrusion upon the constitutionally protected interests of the parent.

(Citations omitted.) (Emphasis supplied.)

■ Thus, in order for Jeanne's religion to constitute a ground for awarding custody to Larry, we must be able to determine from the record that the Jehovah's Witness religion as practiced by Jeanne constitutes an immediate and substantial threat to the minor children's temporal well-being. Courts from other jurisdictions that have dealt with this same issue have come down on both sides. See, generally, Annot., 22 A.L.R.4th 971, 998-1006 (1983).

As evidence of an immediate and substantial threat to the minor children, Larry makes reference to the fact that even in the case of a medical emergency, Jeanne would refuse to consent to any of the children's receiving a blood transfusion. There is also testimony in the record from a teacher and the principal at the minor children's elementary school indicating that Jeanne's insistence that the children not participate in the celebration of any birthday or holiday, as well as the fact that they are not allowed to pledge allegiance to the flag, causes the children to feel confused and separated from the other children.

■ The problem with Larry's argument is that the record is devoid of any expert testimony indicating that Jeanne's religious practices are imminently harmful to the children. The U.S. Constitution flatly prohibits any court from evaluating the merits of religious doctrine or defining the contents of that doctrine. *Thomas v. Review Bd., Ind. Empl. Sec. Div.*, 450

U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981). While activities like celebrating birthdays and holidays, saying the Pledge of Allegiance, and participating in extracurricular activities are considered by most people to play an important role in the socialization of children, "we need to separate the value judgments implicit in the so-called norm from any actual harm caused by these practices." *Pater v. Pater*, 63 Ohio St. 3d 393, 398, 588 N.E.2d 794, 799 (1992). "[A] court must base its decision that a particular religious practice will harm the mental health of a child on more than the fact that the child will not participate in certain social activities." *Id.* at 399-400, 588 N.E.2d at 800. The record in the instant case contains no convincing evidence indicating that the limitations Jeanne places on the minor children's activities constitute a threat of immediate and substantial harm to the children. Therefore, we cannot say that Jeanne's actions in this regard negatively impact on her ability to be the custodial parent. See, *Smith v. Smith*, 90 Ariz. 190, 367 P.2d 230 (1961); *In re Marriage of Urband*, 68 Cal. App. 3d 796, 137 Cal. Rptr. 433 (1977).

Likewise, regarding Jeanne's refusal to consent to a blood transfusion for her children even in the event of an emergency, no evidence was presented showing that any of the minor children were prone to accidents or were plagued with any sort of affliction that might necessitate a blood transfusion in the near future. We cannot decide this case based on some hypothetical future accident or illness which might necessitate such treatment. See, *In re Marriage of Urband, supra*; *Waites v. Waites*, 567 S.W.2d 326 (Mo. 1978). Facts such as the statistical frequency of blood transfusions for normal children and the degree of risk involved in taking or refusing blood or chemical substitutes must be proved by proper evidence, like any other facts. *Osier v. Osier*, 410 A.2d 1027 (Me. 1980). "In the absence of any such proof of that threshold factual requirement, there could be no legitimate occasion for the court's impingement upon [a parent's] constitutionally protected liberty interests." *Id.* at 1031 n.7.

Larry did not present sufficient evidence to convince us that Jeanne's religious practices pose an immediate and substantial threat to the minor children's temporal well-being,

so we are constitutionally prohibited from probing into the substance of Jeanne's religious beliefs and interpreting them for ourselves. See, *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963); *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1 (1990). The record reflects that both Larry and Jeanne have problems. However, the independent court-appointed psychologist who interviewed the entire family recommended that custody be awarded to Jeanne. Other evidence in the record supported that finding. Therefore, upon our de novo review, we hold that the district court did not abuse its discretion in awarding custody of the couple's minor children to Jeanne.

### 2. Exclusion of Evidence Indicating that Jehovah's Witnesses Are a Cult

As his second assignment of error, Larry contends that the district court abused its discretion in excluding all the evidence that Larry presented which related to classifying the Jehovah's Witnesses as a cult. In particular, Larry complains that the district court refused to allow his expert witness on cults to testify regarding the status of the Jehovah's Witnesses as a cult.

Our review of the record indicates that the district court exhibited extreme tolerance with regard to Larry's counsel's presentation of this evidence. Indeed, in one instance, the trial judge stepped in and questioned the witness in a manner which aided Larry in adducing the testimony he sought. Jeanne's counsel made several evidentiary objections, which the trial judge properly ruled upon. There are 33 pages of direct examination testimony from this expert witness. The record reflects that the trial judge allowed the witness to fully explain the analysis behind his opinion that the Jehovah's Witnesses are a cult. Therefore, this assignment of error is without merit.

### 3. Limitation of Cross-Examination and Refusal to Reschedule Trial

In Larry's third assignment of error, he contends that the trial judge erroneously limited the time for his cross-examination of Jeanne and further complains that the trial judge abused his discretion in refusing to reschedule the trial so that the cross-examination could be completed. The record does reflect

that after 15 pages of cross-examination by Larry's counsel of Jeanne, the trial judge informed Larry's counsel that he had 10 minutes remaining to complete his cross-examination of that witness. Larry's counsel cross-examined Jeanne for another 3 pages' worth of testimony, then stated that he had no further questions. After redirect examination, Larry's counsel was permitted to conduct a full recross-examination. At no time did Larry's counsel object to the judge's time limitation, nor did counsel ever request additional time or that the trial be rescheduled.

A trial judge has broad discretion over the conduct of a trial. *Robison v. Madsen*, 246 Neb. 22, 516 N.W.2d 594 (1994). Failure to make a timely objection waives the right to assert prejudicial error on appeal. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

Based on these propositions and our de novo review of the record, we hold that it was not an abuse of discretion for the trial judge to limit the time for cross-examination. Larry's failure to object to the limitation imposed by the trial judge effectively waived his right to raise that ruling as an error on this appeal. Therefore, Larry's third assignment of error is without merit.

### 4. Sustaining and Overruling Various Objections

As his fourth assignment of error, Larry generally argues that the district court erred in its rulings on various objections. Larry did not argue or identify which objections he was referring to. A claimed prejudicial error must not only be assigned, but must be discussed in the brief of the asserting party. *Brewer v. Brewer*, 244 Neb. 731, 509 N.W.2d 10 (1993). Larry appears to be asking us to review each individual evidentiary ruling made by the district court to see if that ruling might have been incorrect. We decline his invitation.

### 5. Trial Judge's Failure to Remove Himself From the Instant Case

Larry's final assignment of error is that the trial judge abused his discretion in not recusing himself on the grounds that he had prejudged the case in a fashion that affected his ultimate decision. Again, there is no merit to Larry's assign-

ment of error. Where a case on appeal is tried de novo, refusal by the trial judge to disqualify himself or herself is immaterial. *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980). In the instant case, Larry never made a motion to disqualify the trial judge. Additionally, this assignment of error was not discussed in Larry's brief and therefore will not be considered. See *Brewer v. Brewer, supra*.

## V. CONCLUSION

Upon a de novo review of the record, we conclude that the district court did not abuse its discretion in awarding custody of the four minor children to Jeanne. Larry's other assignments of error are without merit.

AFFIRMED.