IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 25, 2013 Session

**Kate Marie Belardo v. Hector Belardo, Jr.**

**Appeal from the Chancery Court for Williamson County**
**No. 36512     Derek K. Smith, Judge**

---

**No. M2012-02598-COA-R3-CV - Filed November 1, 2013**

---

This case concerns custody and alimony decisions relative to a divorce. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed and Remanded.**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and DAVID R. FARMER, J., joined.

Mark T. Freeman, Nashville, Tennessee, for the appellant, Hector Belardo, Jr.

Keith H. Solomon, Brentwood, Tennessee, for the appellee, Kate Marie Belardo.

OPINION

The parties, Kate Marie Belardo ("Mother") and Hector Belardo, Jr. ("Father") were married in 2007 and have one child together, born in 2008. The parties separated on July 30, 2009, and Mother filed a Complaint for Divorce on August 11, 2009. Included in the Complaint was a request by Wife for an *ex parte* restraining order, preventing Father from having unsupervised time with the child. On August 12, 2009, the trial court denied Mother's request for an *ex parte* restraining order, finding that there was no evidence that Father posed a substantial or significant threat of harm to the child. On October 29, 2009, the parties agreed to a temporary parenting plan in which Father was awarded parenting time with the child two days a week for several hours. However, Father was not awarded any overnight

visitation with the child. On May 27, 2011, Father filed a Motion for an Emergency Restraining Order, preventing Mother from having any unsupervised time with the child. Specifically, Father cited the fact that prior to trial, he had learned that Mother had been hospitalized several times due to her unstable mental state, *see* further discussion below. Father maintained that Mother's visitation should be supervised throughout the trial on this cause.

Based on allegations that Father was physically and sexually abusing the child, on November 17, 2011, Mother filed a Petition for a Temporary Order of Protection to restrict Father's parenting time. Mother alleged that the child told her that Father wrestled with the child and the wrestling became sexual in nature. Mother took the child to the hospital for an exam and reported the allegations to the Department of Children's Services. The results of the various examinations were inconclusive and Father denied the allegations. On the same day, the trial court denied Mother's request for an Emergency Order of Protection and set the matter for a full hearing. In response to Mother's allegations, on November 18, 2011, Father filed a Motion for Contempt and for another Restraining Order against Mother based on her allegations. Father asked that the trial court enter an order requiring Mother to produce the child for visitation. Father's motion was later resolved by an agreed order of the parties, as discussed below.

Mother filed a notice of dismissal of her Petition for an Order of Protection on December 8, 2011. The trial court thereafter dismissed Mother's Petition on December 15, 2011. Mother, however, filed another request for an Order of Protection on January 31, 2012, alleging again that Father was physically and sexually abusing the child. The trial court denied the request on February 13, 2012, finding that there was "no evidence to support [M]other's allegations that [F]ather had physically or sexually abused the minor child in any way." At the time of trial, Mother had withdrawn all allegations against Father and did not seek any restrictions on his visitation. During this time, on November 29, 2011, the trial court entered an agreed order evidencing the parties' agreement resolving all pending issues with regard to the parenting time of each party, in which the parties agreed to share equal parenting time with the child pending a final hearing.

The trial was held on July 2, 2012. At trial, Mother testified that due to her young age (she was 20 at the time of the marriage; Father was 38), Father was able to manipulate and control her through religion. Mother testified that although the parties attended her preferred church, Strong Tower Church ("the Church"), throughout the marriage, Father would often cite religion to justify his controlling nature. For example, Mother testified that she felt like a trophy wife during the marriage and that Father made her maintain a gym schedule and diet in order to return to her pre-pregnancy weight. To this end, Mother testified that Father once gave her a card that cited a biblical passage about the wife being the lesser vessel than the

husband. Attached to the card was a certificate for a two-hour workout session with Father. Father did not deny giving Mother the certificate, but did deny sending Mother cards with biblical passages in an effort to control Mother. Mother testified to two other incidents in which Father became upset because Mother was consuming food that was apparently off-limits, including chewing gum and diet soda. Father did not deny that he told Mother that she should not chew gum or drink diet soda, but contended that the parties had agreed that such items were unhealthy. Mother further testified that Father was very controlling about the cleanliness of the parties' home, once telling Mother's older son to keep his head down when walking throughout the home to look for crumbs and becoming upset when Mother walked on the grass at their home. Father denied that he was in any way controlling, or that he ever manipulated Mother, through religion or other means. To support his contention that he did not have controlling tendencies, Father called a work colleague, who testified that Father had never exhibited controlling tendencies at work. Instead, the colleague testified that Father was friendly, helpful, and well-liked by those with whom he worked.

Mother testified that Father continued his controlling actions after the separation, including trying to give her gifts through the child's preschool teacher, as well as sending her numerous text messages about reconciliation. The record includes several text messages from Father, entered into evidence without objection, in which Father asked Mother to pray for forgiveness with him in order to reconcile. The text messages also show that Mother asked Father to attend a session with Mother's psychologist, but Father never agreed. The text messages further show that Mother and Father could not agree on a counselor for the child, who was three years old at the time of trial. With regard to this incident, Mother testified that when she was seeking a counselor for the child, Father recommended several counselors. Mother testified that the catalyst for the counseling was her concern over Father's possible abuse, and the fact that the child has some trouble with acting violent toward his older brother.[1] When Mother called the counselors, however, the ones recommended by Father were marital counselors, rather than child counselors. Mother testified that she had taken the child to counseling and that he seemed to be doing well. Otherwise, Mother testified that the child is extremely intelligent for his age, can speak several languages, and loves to cook. Another example Mother gave of Father's controlling nature is that he refused to take the child to swimming lessons during his parenting time because that would "take away from his time" with the child.

Mother's mental state was a point of contention at trial. According to Mother, she was sexually assaulted as a teenager, which led her to abuse alcohol and drugs. Mother, however, was able to take control of her issues for some time, eventually graduating from nursing school and obtaining a job. Sometime after the parties' son was born, however,

---

[1] Mother has a son from a previous relationship.

Mother's mental issues reemerged. Both Mother and Father testified that Mother became very depressed, suffered from mood swings, and would often react in anger. Father testified that he believed that Mother was suffering from post-partum depression. Accordingly, the parties went to Mother's ob-gyn, who prescribed Mother an anti-depressant. However, when the issues that had emerged between the parties did not dissipate, the parties turned to their Church for guidance. The Church referred the parties to the Refuge Center counseling center, and the parties agreed to participate in that program.

The counseling initially consisted of a one hour intake session with both parties and then each party had a separate one hour session. The purpose of the initial three sessions was to determine if the parties' issues could be treated with couples' counseling or if the parties first needed individual counseling. Kyle Turner, the psychologist that performed both the initial intake and Father's individual session, testified at trial. Although Mr. Turner had earned his Masters in Counseling at the time of the events at issue, he was still in training to become a fully licensed mental health service provider. Mr. Turner testified that after meeting with both Mother and Father together, and Father individually, he recommended that Father receive individual counseling due to his power and control issues. Specifically, Mr. Turner stated that Father exhibited the following classic signs of power and control issues: blaming, minimizing, denying, veiled threats, and principles of entitlement to exert power and control, such as using male privilege. Due to this diagnosis, Father was referred to individual counseling.[2] Because the parties were initially referred to counseling through Mother's Church, which paid for some of the treatment, the counseling center sent a letter to church leaders, stating that Father was referred to individual counseling due to his purported power and control issues. Mr. Turner could not produce any form in which Father authorized any of the information regarding the counseling to be sent to the Church.

After the letter was sent, Mother decided to separate from Father. The Church apparently supported this decision and presented Father with a "separation agreement," which outlined that Father was only to have minimal visitation with the parties' son. Father, in his testimony, blamed the Church for the demise of the marriage, alleging that the Church had forced Mother to leave Father while she was in a vulnerable mental state. Mother denied that the Church forced her to do anything and stated that she left Father when the counseling allowed her to see that she was allowing herself to be controlled and manipulated by Father.

At the time Mother moved from the marital home in the summer of 2009, she moved in with her parents. During this time, however, Mother's mental state continued to

---

[2] According to the record, Father did take part in some individual counseling with another counselor—approximately seven additional sessions. However, the therapy was terminated at Father's request and the other counselor was not called to testify in this case.

deteriorate. It was undisputed that Mother was hospitalized ten times for mental issues during the marriage and throughout the pendency of the divorce, attempted suicide on at least two occasions, and received electroconvulsive therapy. During these hospitalizations, the parties' child stayed with Mother's parents. Mother and her own father both admitted that they did not inform Father that Mother was hospitalized. Instead, Mother's father told Father that Mother was fine or that Mother was on vacation.

Mother took short-term disability leave from her employer in the spring of 2010 because she was unable to maintain her present job, which required extensive travel and work from home in addition to regular full time hours. When the disability ran out, Mother took leave pursuant to the Family Medical Leave Act. Subsequently, in May of 2011, Mother was approved for disability through the Social Security Administration. Mother testified that she is hoping to enroll in a state program to improve her work skills and that she plans to change careers to some occupation less stressful than nursing.

In January of 2011, Mother began seeing a new counselor for behavioral therapy, Dr. Eboni Webb, a licensed psychologist. Mother was referred to Dr. Webb through Strong Tower Church, of which Dr. Webb is also a member. Dr. Webb testified *via* video deposition at trial. According to Dr. Webb, Mother has a current diagnosis of bipolar disorder, post-traumatic stress disorder, major depressive disorder, and borderline personality disorder. Mother takes a number of medications prescribed by a psychiatrist.[3] While she was Dr. Webb's patient, in the summer of 2011, Mother decided to move to her own apartment with the children. Mother's parents objected to Mother taking the children from their home, even threatening to call the Department of Children's Services. Eventually, Mother and her parents decided that Mother would move to the apartment on her own, and that the children would gradually transition to the apartment. However, Mother testified that shortly after moving to the apartment, she became anxious and began to have thoughts of self-harm. Accordingly, she called Dr. Webb. Through the counsel of Dr. Webb, Mother agreed to be admitted to the hospital for observation. Mother was released from the hospital and completed her move to her own apartment around September of 2011. The children fully moved to live with Mother in January of 2012.

According to both Mother and Dr. Webb, there were no instances, between January 2012 and the date of trial, where Mother experienced thoughts of self harm. Instead, Dr. Webb testified that Mother's mental health had improved greatly through counseling and the administration of medication. Dr. Webb testified that Mother had already completed one phase of her treatment and that her counseling sessions had been decreased from several times a week to only one time per week. Dr. Webb further testified that Mother is med-

---

[3] Mother's psychiatrist did not testify at trial.

compliant and that she always appears on time for her sessions. Specifically, Dr. Webb opined that Mother is making appropriate decisions to ensure her health and the health of her children, and that she did not believe that Mother was a danger to the children. Dr. Webb further opined that Mother appears to be able to maintain living on her own with the children, and that she believes that Mother could maintain full time employment in a less stressful field. There is no evidence in the record that Mother ever put the children in danger or left them unsupervised.

Father disagreed. At trial, he sought to restrict Mother's time with the child to only supervised visitation, citing Mother's hospitalizations. When asked by the trial court who Father would be comfortable supervising the visits, Father's only suggestion was himself. Father also blamed Mother's allegations against him on what he perceived to be her distorted memory of the events prior to the marriage. Dr. Webb confirmed that electroconvulsive therapy can cause loss of memory. In fact, Dr. Webb testified that Mother once stated that she could not remember why she had left Father. Mother also admitted that she had lost some memories as a result of the treatment, but stated that she had vivid and clear memories of most incidents, which she confirmed from her journal entries made during the time at issue.[4]

After the parties separated, Father testified that Mother did not inform Father of her ongoing hospitalizations or offer to allow Father to keep the child. Mother testified, in contrast, that she tried to keep Father up to date about her whereabouts, but that she did not like to hear Father's opinions about her medical care. Mother's parents cared for the child during this time and, according to Father, objected to Mother moving out of the parents' home, for fear that the children would not receive adequate care. Mother testified that with her parent's approval, she "slowly moved" her children to their new home until the children were living solely in Mother's apartment in January 2012. Mother testified that around this time, she noticed bruising on the parties' child that made her suspect child abuse. Prior to trial, the trial court denied all requests to limit Father's visitation based on the suspected child abuse. However, in her brief, Mother does not dispute the trial court's conclusion that no abuse occurred. According to Mother, her only income is her Social Security benefits in the amount of $2,280.00 per month. In contrast, Father earns approximately $7,500.00 per month through his employment as a nurse.

At the conclusion of the trial, the trial court named Mother the primary residential parent and ordered Father to pay child support. Mother was awarded 183 days with the child and Father was awarded 182 days, taking into account Father's work schedule. No restriction was placed on Mother's ability to take the child to the Church. Mother was awarded alimony

---

[4] Mother's journal was not entered as an exhibit at trial and, therefore, is not contained in the record on appeal.

*in solido* in the amount of $12,000.00 to pay attorney's fees. The trial court also required Father to pay Mother's COBRA payments for one year or until Mother obtained insurance through a job, whichever came first. Father filed a Motion to Alter or Amend the Judgment, which was denied on December 5, 2012. The trial court entered an Amended Final Order on December 5, 2012, containing detailed findings of fact and conclusions of law, as discussed in detail below.

## II. Statement of the Issues

Father appeals, raising the following issues:

1. Whether the trial court erred in naming Mother primary residential parent of the child?
2. Whether the trial court erred in ruling that Mother be allowed to take the minor child to Strong Tower Church, considering Father's objections?
3. Whether the trial court erred in awarding alimony *in solido* to Mother in the amount of $12,000.00 for attorney's fees.
4. Whether the trial court erred in awarding Mother alimony for purposes of covering her COBRA benefits for a year?

## III. Primary Residential Parent

The first issue in this case is whether the trial court erred in naming Mother primary residential parent. Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Tenn. R. App. P. 13(d). In applying the *de novo* standard, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." **Hyde v. Amanda Bradley**, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct.12, 2010) (citing **Johnson v. Johnson**, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." **Hyde**, 2010 WL 4024905, at *3 (citing **Johnson**, 169 S.W.3d at 645). Accordingly, appellate courts review a trial court's decision regarding which parent to name as the primary residential parent for an abuse of discretion. *See* **Fulbright v. Fulbright**, 64 S.W.3d 359, 365 (Tenn. Ct. App. 2001) (citation omitted); *see also* **Porter v. Porter**, No. M2012-00148-COA-R3-CV, 2013 WL 313838, at *14 (Tenn. Ct. App. 2013) (Kirby, J., concurring) (declining to reverse the

trial court's ruling only because of the "high standard" required under abuse of discretion review). "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See Eldridge*, 42 S.W.3d at 88. As our Supreme Court has explained,

> When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving [parental responsibilities], to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf. State v. Pappas*, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); *Bradford v. Bradford*, 51 Tenn. App. 101, 364 S.W.2d 509, 512–13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g., State ex. rel Vaughn v. Kaatrude,* 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Eldridge*, 42 S.W.3d at 88. The trial court's discretion, however, is not unbounded. *Hogue*, 147 S.W.3d at 251 (citation omitted). The court must base its decision upon proof and apply the appropriate legal principles. *Id.* (citation omitted).

"By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or

her needs." ***Burden v. Burden***, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting ***Cummings v. Cummings***, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004)). "In choosing which parent to designate as the primary residential parent for the child, the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." ***Chaffin v. Ellis***, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing ***Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn. 1983)). "In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a)." ***Ellis***, 211 S.W.3d at 286 (footnote omitted). While "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination," the statute nevertheless "requires the trial court to consider all the applicable factors."[5] ***Murray v. Murray***, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept.28, 2010). Moreover, this Court has encouraged trial courts to "be as precise as possible in making child custody findings" in order to facilitate meaningful appellate review. ***In re Elaina M.***, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8 (Tenn. Ct. App. Oct. 25, 2011).

Accordingly, we will consider each applicable factor contained in Tennessee Code Annotated Section 36-6-106(a), along with the trial court's findings and the evidence contained in the record.

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

The trial court found that both parents "adore [the child]" and that the factor applied equally to both parents. The trial court specifically found that Mother's prior allegations of abuse of the child by Father were unfounded. On appeal, the parties do not dispute the finding that this factor favors neither parent.

> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

The trial court found that this factor also applies equally. Father disputes this finding because

---

[5] This Court has previously expressed concern that the case law holding that trial judges need not articulate the factors pursuant to Tennessee Code Annotated Section 36-6-106(a) appears to conflict with the intent of Tennessee Rule of Civil Procedure 52.01. *See **In re Elaina M.***, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8 n.13 (Tenn. Ct. App. Oct. 25, 2011).

he asserts that Mother did not care for the child during her ten hospitalizations, whereas he cared for the child during his time with the child. However, Mother's father's testimony shows that even when Mother was unable to care for the child independently of her parents' help, she did spend substantial amounts of time with the child. Indeed, Mother's father testified that even when Mother was living separately from the child between August 2011 and January 2011, Mother still endeavored to spend as much time as possible with the child, including nights and weekends, and took primary responsibility for the child while she was with him. Father and Mother both testified that even when Mother lived separately from the child, she was his primary custodian, responsible for feeding, clothing, and putting the child to bed the majority of the time. Furthermore, for approximately five months prior to trial, Mother and the child were living independently from her parents. Accordingly, we cannot conclude that the evidence preponderates against the trial court's finding that this factor weighs equally in favor of both parties.

> (3) The importance of continuity in the child's life and the length
> of time the child has lived in a stable, satisfactory environment;

The trial court found that the issue of continuity weighed equally in favor of both parties. Father disputes this finding, however, and asserts that Mother's hospitalizations and move from the marital home, to her parents, and finally to her own apartment evidence a lack of stability. We agree that Mother's multiple hospitalizations show a lack of stability on Mother's part prior to September 2011. However, since September of 2011 to the time of trial, Mother's life has been very stable. In addition, Mother's action in slowly transitioning the child from her parents' home to her own apartment shows that Mother is concerned with maintaining as much continuity as possible for the children. In all divorces, there will be some change to which a child must adjust, and Mother's actions show that she endeavored to cause as little instability through that change as possible. Accordingly, the evidence does not preponderate against the trial court's finding that this factor weighs in favor of neither party.

> (4) The stability of the family unit of the parents or caregivers;

Father argues that the trial court erred in finding this factor in favor of Mother. The trial court found that this factor weighs in favor of Mother "tremendously" because of the support that Mother receives as compared to Father. Specifically, the trial court found that the child's care, when each parent must be away from the child, was important in deciding this factor. Mother and her Father both testified that Mother's parents are willing and able to care for the child when Mother must be away from the child. Indeed, nothing in the record suggests that the child's maternal grandparents have anything but a close and loving relationship with the child and that they are available to help with child care. In contrast, Father testified that if he were forced to be away from the child during his parenting time (an event that would occur

far more often under Father's proposed parenting plan, which limited Mother's visitation substantially), Father would rely only on two friends to care for the child. These friends were not called to testify and very little evidence was adduced regarding their fitness to care for the child. Father did not testify about any other family members or caretakers who would be able to care for the child in his absence. Under these circumstances, we cannot conclude that the trial court's conclusion that Mother's family unit is more stable than Father's was erroneous.

(5) The mental and physical health of the parents or caregivers;

Mother's mental health was the largest point of contention at trial. With regard to this factor, the trial court found that while Mother had "mental problems" during the pendency of the divorce, based on Dr. Webb's testimony, "Mother's depression and suicidal tendencies had been in remission since September 2011; so the Court finds that Mother has her problems, but she has them under control." Implicitly, the trial court found that this factor favored neither party. Father disagrees, and argues that because of Mother's ten hospitalizations prior to the divorce trial, this factor should weigh in his favor. We agree with the trial court. Mother's therapist, a licensed psychologist, testified without dispute that Mother was doing everything in her power to work through her mental issues. Mother takes all prescribed medications and attends all required therapy sessions. Although one counselor testified that Father had his own mental issues, in the form of power and control issues, Father, in contrast to Mother's diligent efforts to improve her mental health, refused to continue individual counseling to combat these issues. Further, at the time of trial, Mother had not had an incident of suicidal thoughts since the previous summer. Finally, nothing in the record suggests that Mother's issues prevented her from properly caring for the child since she, her older son, and the child moved into an apartment together in January 2011, approximately five months prior to trial. The trial court, in its discretion, found that Mother's admitted mental issues, coupled with her continued treatment and improvement, should not weigh against her in determining which parent should be named primary residential parent.

The parties cite no cases in which a parties' mental health issues, if appropriately treated, were found to weigh in favor of naming the other parent primary residential parent. For example, in *In re Alexandra J.D.*, No. E2009-00459-COA-R3-JV, 2010 WL 5093862 (Tenn. Ct. App. Dec. 10, 2010), this Court concluded that the evidence did not preponderate against the trial court's finding that the mental health factor weighed in father's favor when the evidence showed that mother had an "extended history of behavioral health issues including the mother's admission that she has been diagnosed as being bipolar, anxiety disorder and depression and anxiety or panic attacks." *Id.* at *5. The Court noted, however, that the trial court relied, at least in part, on the fact that mother was not seeking treatment for her disorders. *Id.* In contrast, in this case, the evidence shows that Mother is seeking

treatment and that the treatment has been largely successful in combating Mother's issues. In another somewhat analogous case, *Kellett v. Stuart*, 206 S.W.3d 8 (Tenn. Ct. App. 2006), this Court affirmed a trial court's determination that mother's bipolar disorder, and consequent hospitalization, did not constitute a material change in circumstances affecting the best interests of the child. *Id.* at 16–17. According to the Court, the trial court specifically found that mother's disorder and resulting hospitalizations "pose[d] no threat whatsoever to the children and that they thrived while in [mother's] custody and care." *Id.* at 16. The Court of Appeals concluded that the evidence in the record did not preponderate against this finding, and accordingly, affirmed the trial court's refusal to change custody to father. *Id.* Likewise in this case, there is simply no evidence that the child has been negatively effected by Mother's disorders. In addition, the evidence shows that due to Mother's consistent treatment, she is no longer experiencing symptoms that make her unable to appropriately parent the child.

From our research, we note several cases from our Sister States in which evidence that a parent suffered from mental issues was likewise not determinative in the courts' custody decisions. In these cases, the courts considered evidence that showed that the parent with the mental issues had sought or was seeking treatment, which had partially or completely ameliorated the parent's symptoms. *See, e.g., Hall v. Hall*, 598 So 2d 960, (Ala. Ct. App. 1992) (awarding primary custody to mother despite evidence that she had suicidal tendencies, when the evidence showed that mother sought appropriate treatment and had not had an episode in several years); *Turberville v. Turberville*, 617 So 2d 284 (Ala. Ct. App. 1992) (concluding that the trial court did not err in awarding custody to mother, when the evidence showed that she had recovered from her illness and was fully capable of seeing to the well-being of the child); *Voelker v. Voelker*, 520 N.W.2d 903 (S.D. 1994) (affirming the award of custody to mother, who was still seeking treatment for depression and a suicide attempt, when the evidence showed that father also had mental issues, but he was not seeking treatment to combat them, unlike mother); *Timmons v Timmons*, 605 So 2d 1162 (La. Ct. App. 1992) (affirming award of custody to mother, who had diagnosed mental illness and was hospitalized during the pendency of the divorce, when mother was the primary custodian of the child and father only reluctantly participated in counseling); *Garrett v. Garrett*, 527 N.W.2d 213 (Neb. Ct. App. 1995) (affirming award of custody to mother, where she, unlike father, sought treatment and medication to combat her mental issues). Likewise in this case, Mother has sought consistent and diligent treatment to combat her mental issues. In addition, Dr. Webb testified without dispute that Mother's current issues should not effect her ability to maintain employment or parent the child. Under these circumstances, we decline to conclude that the evidence in the record preponderates against the trial court's finding that this factor weighs in favor of neither party.

(6) The home, school and community record of the child;

The trial court found that this factor does not weigh in favor of either parent. Neither party disputes that finding on appeal.

> (7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

The child, due to his young age, did not express a preference. Accordingly, this factor favors neither party.

> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

The trial court found that this factor weighs in favor of Mother, stating:

> [T]he Court does believe that Father has engaged in some unintentional emotional abuse, dealing with soft drinks, whether Mother could drink them when she was pregnant, and that Mother could not walk on the grass; there was also testimony that Father was a bit obsessed with cleaning up the house; based on the demeanor of Mother, the Court believes there has been some unintentional abuse and that Mother exaggerated it some and Father diminished it some, but based upon the testimony of the parties and their demeanor, the Court is satisfied that this factor weighs in favor of Mother.

The trial court's determination of this factor is based, in part, on his assessment of both Mother's and Father's credibility. The trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Franklin County Bd. Of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).

Father disputes the trial court's credibility findings by pointing to evidence that Mother had some memory loss due to the electroconvulsive therapy that she underwent subsequent to the separation. Mother does not dispute that she had some memory loss due to the therapy, but contends that she has clear memories of the incidents that she described in her testimony, and that these memories are corroborated by her personal journal from that time. Indeed, Dr. Webb testified that the electroconvulsive therapy causes memory lapses,

but did not testify that the memories that Mother can recall were in any way distorted by the therapy. Father did not deny many of the allegations against him at trial, but instead, argued that Mother had blown his actions out of proportion or that he was only joking. Under these circumstances, we cannot conclude that the trial court abused its discretion in crediting Mother's testimony regarding the unintentional emotional abuse, and therefore, affirm the trial court's finding that this factor weighs in favor of Mother.

> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child;

The trial court also concluded that this factor weighed in favor of Mother. Specifically, the trial court found that "the maternal grandparents . . . are able to frequent the home of the minor child and [Mother], and the Court finds that they are good individuals and positive individuals to make a positive impact on [the child's] life." Father argues that the trial court misapplied this factor because the factor only involves "a situation where there is a person living in a residence or [that] frequents the residence of the minor child that in some way could pose a threat to that minor child." However, Father cites no authority for this narrow interpretation. Nothing in the statute limits the trial court from considering the positive impact of those people who live with or are frequently around the child. In addition, the statute at issue specifically contemplates that the trial court may consider all relevant factors. Accordingly, the trial court did not err in finding this factor in favor of Mother.

> (10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

The trial court found that this factor weighed in favor of neither party. Father argues that the trial court erred in finding that this factor did not weigh in his favor because of Mother's past

action in seeking several restraining orders against Father. Father argues that these facts show that Mother has not "encourage[d] a close and continuing parent-child relationship between the child" and Father. We agree that Mother's past actions may have interfered with Father's ability to parent his child. However, we agree with the trial court that this fact does not necessitate a finding that this factor weighs in favor of Father. Father also filed a motion seeking to limit Mother's time with the child. By the time of trial, however, Mother had withdrawn her concerns about Father's parenting and had proposed that Father have substantially equal time with the child. The trial court even remarked that Mother "truly, sincerely in her heart, wants [F]ather to have a tremendous, positive and active relationship with [the child.]" Again, this determination is based on an assessment of Mother's credibility, which is entitled to great deference on appeal.

In contrast, during trial, Father sought to severely limit Mother's time with the child, despite the fact that there was simply no evidence presented that the child was in any danger from having unsupervised visitation with Mother. Further, Father testified that he would only be comfortable if Mother has supervised visitation with the child and if he were the person to supervise the visits. From the totality of the evidence, it appears that both parties have acted, at different times during the pendency of the divorce, to discourage the other parents' relationship with the child. Accordingly, we agree with the trial court that this factor favors neither party.

After a review of the relevant factors, we note that factors 1, 2, 3, 5, 6, and 10 weigh in favor of neither party. Factors 4, 8, and 9 weigh in favor of Mother. No factors weigh solely in favor of Father. This Court has held, however, that:

> Ascertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of [one parent or the other]. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and [his or her parents], the consideration of one factor may very well dictate the outcome of the analysis.

*Allen v. Allen*, No. W2012-00541-COA-R3CV, 2013 WL 1324917, at *9 (Tenn. Ct. App. April 3, 2013) (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (applying the above doctrine in a termination of parental rights case)). After reviewing the evidence in the record, we cannot conclude that the trial court abused its discretion in naming Mother primary residential parent of the child. While the bulk of the record involves allegations against the parties, we note that very little of the testimony at trial concerned how the parties'

issues actually affected the best interests of the child. The record reflects that the child is intelligent and happy; however, the record also shows that the child has exhibited some violent tendencies toward his brother. The record reflects that Mother took appropriate action to contend with this issue, including taking the child to counseling. The text messages in the record reflect that Father was less than helpful in acting to obtain an appropriate psychologist for the child. We recognize that Mother has serious mental issues, which require ongoing treatment. However, Mother has stabilized due to considerable diligence and persistence on her part. As previously discussed, this Court must review the trial court's decision regarding custody and visitation under the abuse of discretion standard. *Johnson*, 169 S.W.3d at 645. Under this standard, we must view the trial court's decision in the light most favorable to it, and uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness." *Gonsewski*, 350 S.W.3d at 105–06; *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). Thus, "we are not permitted to substitute our judgment for that of the trial court." *Caldwell*, 250 S.W.3d at 869. Under these circumstances, we cannot conclude that the trial court abused its discretion in naming Mother the primary residential parent.

## IV. Mother's Church

Father next argues that the trial court erred in failing to place any restrictions on Mother's ability to take the child to her Church. Father contends that the Church was the catalyst for the demise of the parties' marriage and believes that the Church will have a negative impact on the child's view of Father. Mother, on the other hand, agreed not to have the child baptized in the Church or to make the child a full member of the Church, but wanted to continue to take the child to the Church on Sundays. Father's schedule causes him to work on Sundays, and Mother's proposed parenting plan, largely adopted by the trial court, awarded parenting time to Mother on Sundays. From our review of Father's brief, however, the section of his brief pertaining to this issue contains no citations to the record, nor any authority to support his position that the trial court erred in allowing Mother to take the child to the Church. This Court has repeatedly held that the failure to include citation to the record or to appropriate supporting authority in the argument section of the brief is a waiver of the issue on appeal. *See, e.g., Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue."); *Owen v. Long Tire, L.L.C.*, No. W2011-01227-COA-R3-CV, 2011 WL 6777014, at *4 (Tenn. Ct. App. Dec. 22, 2011) ("This Court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in their brief."). Thus, this issue is waived.

## V. Alimony

The Tennessee Supreme Court has consistently recognized that trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award. *See, e.g.,* ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 105 (Tenn. 2011); ***Bratton v. Bratton***, 136 S.W.3d 595, 605 (Tenn. 2004); ***Burlew v. Burlew***, 40 S.W.3d 465, 470 (Tenn. 2001); ***Crabtree v. Crabtree***, 16 S.W.3d 356, 360 (Tenn. 2000). Because a trial court's "decision regarding spousal support is factually driven and involves the careful balancing of many factors," ***Gonsewski***, 350 S.W.3d at 105 (footnote omitted), the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support. ***Id***.; ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) ("If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative."). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." ***Id.*** (citing ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011); ***Henderson v. SAIA, Inc***., 318 S.W.3d 328, 335 (Tenn. 2010)). In determining whether the trial court abused its discretion, an appellate court "should presume that the [trial court's] decision is correct and should review the evidence in the light most favorable to the decision." ***Gonsewski***, 350 S.W.3d at 105–06; *see also* Tenn. R. App. P. 13(d) ("[R]eview of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding [s], unless the preponderance of the evidence is otherwise.").

Tennessee recognizes four distinct types of spousal support: (1) alimony *in futuro*, (2) alimony *in solido*, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp. 2012). Alimony *in futuro* is a form of long-term support. An award of alimony *in futuro* is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. ***Gonsewski***, 350 S.W.3d at 107. Alimony *in solido*, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. ***Id.*** at 108. By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training necessary to become self-reliant following a divorce. ***Id***. Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." ***Id***. at 109 (internal quotation marks omitted). In this case, we are concerned only with alimony *in solido*. We begin with the award of alimony *in solido* for Mother's attorney's fees.

### A. Attorney's fees

With respect to the award of attorney's fees in divorce cases, our Supreme Court has stated:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony *in solido*. The decision whether to award attorney's fees is within the sound discretion of the trial court. As with any alimony award, in deciding whether to award attorney's fees as alimony *in solido*, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or the spouse would be required to deplete his or her resources in order to pay them. Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony.

*Gonsewski*, 350 S.W.3d at 113 (citations omitted).

Father first argues that the trial court failed to properly evaluate whether the requested fee was reasonable, citing *First Peoples Bank of Tenn. v. Hill*, 340 S.W.3d 398 (Tenn. Ct. App. 2010). In *First Peoples*, this Court concluded that all requests for attorneys fees are governed by the ethical rules regarding fees, which require that requested fees be reasonable. *See id.* at 409 (citing Tenn. R. Sup. Ct. 8, RPC 1.5 ("A lawyer's fee and charges for expenses shall be reasonable.")). The Court in *First Peoples* vacated the award of attorney's fees, concluding that nothing in the record suggested that the trial court considered the reasonableness of the fee in light of the appropriate factors. Father argues that this Court should likewise vacate the award of attorney's fees and remand to the trial court for consideration of the fee's reasonableness.

We agree that reasonableness is the touchstone inquiry for a request of attorney's fees. However, we disagree that our only option is to vacate and remand the fee in this case. The party seeking attorney's fees has the burden of proving what constitutes a reasonable fee and should be in a position to tender the necessary proof. *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn.1988). As Justice (then Judge) Koch has explained for this Court:

[The party seeking attorney's fees] has the burden to make out a prima facie claim for his request for reasonable attorney's fees. Ordinarily, the party requesting attorney's fees carries this burden by presenting the affidavit of the lawyer who performed the work. Parties opposing a request for attorney's fees should be afforded a fair opportunity to cross-examine the requesting party's lawyer or to present proof of its own.

***Hosier v. Crye-Leike Commercial, Inc.***, 2001 WL 799740, at *6 (Tenn. Ct. App. July 17, 2001) (internal citations omitted). Mother's attorney filed an affidavit in the trial court noting that he had performed work for Mother at a rate of $275.00 per hour and that his total bill was $18,700.00. Father made no objection to Mother's attorney's affidavit, did not question Mother's attorney, and did not present his own proof regarding the reasonableness of the fee. Mother testified that she had paid approximately $4,000.00 in attorney's fees by the time of trial, leaving a $14,700.00 balance remaining. However, the trial court only awarded Mother $12,000.00 in attorney's fees, suggesting that the trial court did consider the reasonableness of the requested fee. Under these circumstances, we decline to conclude that the trial court abused its discretion in awarding Mother a portion of her attorney's fees as alimony *in solido*.

Father also argues that the trial court erred in awarding Mother attorney's fees based on "the applicable factors." However, again this portion of Father's brief contains no authority and no citation to the record. Under these circumstances, Father's argument regarding the applicable factors is waived. *See **Bean***, 40 S.W.3d at 55. Even assuming *arguendo* that this issue was not waived, however, we conclude that the trial court did not err in awarding Mother $12,000.00 in attorney's fees.

Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, including, but not limited to, the statutory factors contained in Tennessee Code Annotated Section 36-5-121(i). The pertinent factors include:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
> (3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). The two most important factors, however, are the disadvantaged spouse's need and the obligor spouse's ability to pay. ***Gonsewski***, 350 S.W.3d at 109–10.

Father points out that the parties were only married for five years and argues that the demise of the marriage was the fault of Mother, rather than himself.[6] Father further argues that Mother received a back payment of Social Security Disability benefits, from which she could have paid attorney fees. In this case, however, Mother's actual income and earning capacity are both substantially lower than Father's. Further, in dividing the marital property, Mother received various household goods and her own vehicle. In contrast, Father received

---

[6] Father asserts that the trial court found Father guilty of inappropriate marital conduct as a ground for divorce. This assertion is not supported in the record. Instead, the trial court declared the parties divorced pursuant to Tennessee Code Annotated Section 36-4-129(b). Accordingly, there is no indication that the trial court considered the fault of the parties in deciding to award Mother alimony *in solido*.

the marital home and the entirety of his investment and retirement accounts that accrued during the marriage. Under these circumstances, we cannot conclude that the trial court abused its discretion in awarding Mother alimony *in solido* in the form of her attorney's fees.

### B. Cobra Insurance Payments

Father next argues that the trial court erred in awarding Mother alimony *in solido* in the form of Cobra Insurance payments for one year, or until Mother was able to gain insurance through her employer. Again, however, Father fails to cite any authority for his contention that the trial court erred, nor does this section of his brief contain any citations to the record. Accordingly, this issue is likewise waived. *See* **Bean**, 40 S.W.3d at 55. Further from our review of the record, we see no abuse of discretion in the trial court's decision. As previously discussed, Mother's income and earning capacity are substantially lower than Father's. In addition, Mother testified that it was very important for her to maintain insurance because of rate increases due to her pre-existing conditions that could occur if there was ever a lapse in coverage. Further, when asked about Cobra payments at trial, Father testified that he wanted to help Mother in any way he could. Under these circumstances, the trial court did not err in awarding Cobra Insurance payments to Mother for one year, or until she could obtain insurance through her employer, whichever should occur first.

### V. Conclusion

The judgment of the Chancery Court of Williamson County is affirmed and this cause is remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant, Hector Belardo, Jr., and his surety.

_____
J. STEVEN STAFFORD, JUDGE